## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JAMES EDWARD GREEN**                                    **CIVIL ACTION**

**versus**                                                                    **NO. 12-2090**

**WARDEN BURL CAIN**                                        **SECTION: "J" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, James Edward Green, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On July 15, 2009, he was convicted of attempted forcible rape

under Louisiana law.[1] On August 28, 2009, he was found to be a third offender and was sentenced as such to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On November 17, 2010, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction, vacated his sentence, and remanded the matter for resentencing.[3]  On June 22, 2011, the state district court resentenced him to a term of twenty years imprisonment.[4]

On June 8, 2012, petitioner filed a petition for a writ of *habeas corpus* with the Louisiana Fourth Circuit Court of Appeal.[5] On June 15, 2012, the Court of Appeal transferred that petition to the state district court for consideration,[6] and petitioner's related writ application challenging that action was denied by the Louisiana Supreme Court on November 2, 2012.[7] Meanwhile, on June 27, 2012, the state district court denied petitioner's request for post-conviction relief.[8]  It is unclear whether that denial was a ruling on the petition transferred from the Court of

---

[1]  State Rec., Vol. VI of VII, transcript of July 15, 2009, p. 124; State Rec., Vol. I of VII, minute entry dated July 15, 2009.

[2]  State Rec., Vol. V of VII, transcript of August 28, 2009; State Rec., Vol. IV of VII, minute entry dated August 28, 2009.

[3]  State v. Green, 52 So.3d 253 (La. App. 4th Cir. 2010) (No. 2010-KA-0008); State Rec., Vol. IV of VII.

[4]  State Rec., Vol. I of VII, minute entry dated June 22, 2011.

[5]  State Rec., Vol. VII of VII.

[6]  State v. Green, No. 2012-K-0858 (La. App. 4th Cir. June 15, 2012); State Rec., Vol. VII of VII.

[7]  State *ex rel.* Green v. State, 99 So.3d 670 (La. 2012) (No. 2012-KH-1604).

[8]  State Rec., Vol. II of VII, Order dated June 27, 2012.

Appeal or whether it was related to another post-conviction filing which is not included in the state court record submitted to this Court.

On August 13, 2012, petitioner filed the instant federal application for *habeas corpus* relief.[9]  As the state notes in its response, petitioner's claims are convoluted; however, it appears that he is asserting the following claims in this federal proceeding:

1. Petitioner was not brought before a magistrate in a timely manner for a determination of probable cause;

2. Petitioner's right to a speedy trial was violated;

3. Petitioner received ineffective assistance of counsel;

4. Petitioner was denied his rights to due process and equal protection; and

5. The prosecution withheld evidence from the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963).

The state concedes that the application is timely.[10]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal

---

[9] Rec. Doc. 3.

[10]  Rec. Doc. 13, p. 13.

habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the

- 4 -

> state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 134 S. Ct. 1697, 1706 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White v. Woodall, 134 S. Ct. 1697, 1701 (2014).

- 6 -

## II.  Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts

of this case as follows:

> Officer Michael Milan of the New Orleans Police Department testified that on February 2, 2007 at approximately 1:00 a.m., he was dispatched to the 100 block of S. Rampart Street regarding a man being held at gunpoint by a citizen in connection with a rape.  When Officer Milan arrived he observed that it was a mostly empty parking lot, save for two large Conex tractor trailers.  He saw a male subject holding a gun on another male subject who was lying face down on the blacktop.  Officer Milan instructed the subject to put away his gun and then handcuffed the suspect on the ground.  Officer Milan secured the scene and advised the dispatcher to notify the rape squad.
>
> Officer Gary Kessler, of the Special Operations Division, Sexual Assault Unit, testified that he arrived on the scene approximately twenty minutes after receiving a call from the command desk.
>
> Initially, he observed the defendant in the back of Officer Milan's police unit.  The victim, J.D., was leaning on the front of the patrol car.[FN2]  Kessler interviewed the victim whom he described as clearly distraught.  He observed that she had lacerations and bruises to her face, head, and back.  There was a laceration over her right eye that was swollen and beginning to close.  Officer Milan identified several photographs taken by the crime lab depicting the victim's condition.  In addition, he identified several photographs of the area behind one of the Conex boxes where the rape took place.

> [FN2] In accordance with La. R.S. 46:1844(W)(1)(a), initials of the victim are used in order to protect her identity.

> Ecoee Rooney, a sexual assault nurse examiner, testified that she completed a sexual examination of the victim.  Rooney reported that the victim was in a great deal of pain as a result of her injuries.  Nurse Rooney noted the victim's clothing was soaking wet from her having fallen in a puddle of water during the assault.  Nurse Rooney completed a rape kit, collecting swabs from each area of injury or where there may have been contact with the suspect.  Nurse Rooney labeled all the swabs carefully and then placed them in boxes and

packaged the entire kit and sealed it.  Some toilet tissue, used by the victim after being admitted, was also collected as evidence.  Nurse Rooney noted micro tears or abrasions at the vaginal opening as well as a contusion to J.D.'s anus.  Nurse Rooney also noted contusions on the victim's buttocks, which would have been consistent with falling.  The victim's toxicology exam was positive for cocaine and marijuana and she admitted to having consumed a small amount of crack cocaine and some marijuana that night.

Mollie Bride, a DNA forensic Scientist at the Louisiana State Police Crime Lab, was qualified as an expert in the field of Forensic DNA analysis.  Ms. Bride testified that she conducted DNA testing on the evidence in the rape kit collected from J.D.  She concluded that the defendant could not be excluded as a contributor to the DNA that was in a piece of toilet tissue.  Testing of another piece of toilet tissue, reflected that there were two contributors to DNA thereon and that neither the victim nor Mr. Green could be excluded as contributors.  This was significant as ninety-nine percent of the population could be excluded as potential contributors, leaving Mr. Green in the one percent of the population that could have contributed the DNA.  Furthermore, Ms. Bride stated that statistically, it was 1.03 billion times more likely that the DNA profile generated from the mixture of DNA identified in the sample was derived from J.D. and the defendant rather than J.D. and an unknown individual.

J.d. testified that at the time of the incident she was homeless and living on the streets of New Orleans.  She related that a little after midnight she was looking for a place to sleep.  When she was on Canal Street in front of a jewelry shop near the corner, a man came up to her from behind, pushed her behind a dumpster in a parking lot behind the jewelry shop near a large white trailer.  The man told her to pull her pants down and to get on her hands and knees.

He attempted to have intercourse with her but was not able to.  Angry, he struck her several times in the head with his fists and continued to do so until, eventually, he grew tired from hitting her.  Ultimately, he was able to have intercourse.

The victim explained that she was on her hands and knees the entire time, was crying and screaming throughout the attack until she could no longer do so because her throat and mouth were so dry.

Finally, the defendant let her up.  Her pants, which were down about her knees, were soaking wet.  She looked up and saw two men, and she yelled for help, letting them know she had been raped.  She

saw that they had a dog and were armed. The men had her assailant get down on the ground. Shortly thereafter the police arrived.

J.D. stated that she did not know the defendant but recalled seeing him on the street on a previous occasion. She admitted previous convictions for possession of crack, distribution of crack, and possession of drug paraphernalia.

Under cross examination, J.D. recalled her previous testimony that the defendant took her across the street to the parking lot were [sic] the rape occurred. J.D. did not try to break away from him because she feared he was armed. Mr. Green told her his name when they were behind the dumpster.

Gregory Black testified that at the time of this incident he was living in the building adjacent to the parking lot. That evening, his associate went out to the parking lot area to walk his dog but, he returned frightened, stating that something wrong was going on in the parking lot. Mr. Black went outside to investigate. He heard a faint cry and then almost a whine, as the victim stated that she was being raped. He was some sixty feet from the trailer. Initially he did not see any movement and then he spotted the silhouette of a man. Gun in hand, Mr. Black moved in closer to see what was happening. The man walked towards Mr. Black with his hands in the air. His pants were down to his knees. Mr. Black ordered the man to the ground repeatedly until he finally complied. Mr. Black held the gun on the defendant and frisked him.

Mr. Black's associate retrieved the woman from behind the trailer. Mr. Black could see that she was badly beaten and that her pants were down to her knees. She appeared to be in shock. Mr. Black called 911.

James Green testified in his own defense. He testified that he was well acquainted with the victim from when he worked as a security guard at the Ozanam Inn, a homeless shelter. Green stated that on the night in question the victim approached him as he exited a convenience store. After sharing a beer and a cigarette with J.D., she inquired whether he had any crack and offered to trade sex for some. Mr. Green told J.D. that he knew where he could get some and related that he visited a friend at a nearby tattoo shop and acquired some crack. He and J.D. went to the parking lot at the victim's suggestion where she smoked the crack in a glass pipe. Green testified that he was unable to have sex with J.D. He stated that after smoking the crack, J.D. started acting crazy. She wanted him to give her his remaining money, six dollars, but he refused. J.D. started hitting him, and he pushed her down in defense. At about that time

- 9 -

he observed the man with the dog, and then he saw Mr. Black appear.[11]

### III.  Petitioner's Claims

### A.  Failure to Provide Timely Probable Cause Determination

In his first claim, petitioner appears to be arguing that he is entitled to federal *habeas corpus* relief because he was not brought before a magistrate in a timely manner for a determination of probable cause.  In Gerstein v. Pugh, 420 U.S. 103 (1975), the United States Supreme Court held that a state "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." Id. at 125 (footnotes omitted).  Sixteen years later, in County of Riverside v. McLaughlin, 500 U.S. 44 (1991), the Supreme Court revisited Gerstein because its "promptness" standard had proven to be unworkably vague.  The Supreme Court then held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein." Id. at 56.

However, even if the alleged violation occurred in this case, which is an issue this Court need not and does not resolve, federal *habeas corpus* relief would be unavailable to remedy that violation.  As the Supreme Court explained in Gerstein:  "[A]lthough a suspect who is presently detained may challenge the probable cause for that confinement, *a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause.*" Gerstein, 420 U.S. at 119 (emphasis added); accord Fleming v. Hargett, No. 98-6059, 1998

---

[11]  State v. Green, 52 So.3d 253, 256-58 (La. App. 4th Cir. 2010) (No. 2010-KA-0008); State Rec., Vol. IV of VII.

- 10 -

WL 427140, at *2 (10th Cir. July 14, 1998) (same); Long v. Hancock, No. 87-6379, 1988 WL 34433 (6th Cir. Apr. 19, 1988) ("[T]he petitioner's application for a writ of habeas corpus fails to raise a colorable federal claim.  A conviction is not rendered illegal merely because the defendant was detained pending trial without a determination of probable cause."); Wright v. Lensing, Civ. Action No. 92-1753, 1993 WL 8327, at *2 (E.D. La. Jan. 14, 1993).  Accordingly, this claim should be rejected.

B.  Speedy Trial

Petitioner next claims that he was denied his right to a speedy trial.  For the following reasons, that claim should likewise be denied.

Petitioner was arrested on February 2, 2007.  More than one year later, he filed a motion for speedy trial with the state district court on February 26, 2008.  That motion was granted that same day, and trial was set for May 13, 2008.[12]  However, the state thereafter filed an opposition arguing that a trial was premature because the state was still awaiting DNA results,[13] and the court reversed its ruling on May 12, 2008, thereby canceling the trial.[14]  On or about March 27, 2009, petitioner then filed a motion to quash the bill of information on the ground that his right to a speedy trial had been violated.[15]  That motion was denied by the state district court on June 17, 2009,[16] and his related writ application was denied by the Louisiana Fourth Circuit Court of Appeal on June 29,

---

[12]  State Rec., Vol. I of VII, minute entry dated February 26, 2008.

[13]  State Rec., Vol. II of VII.

[14]  State Rec., Vol. I of VII, minute entry dated May 12, 2008.

[15]  State Rec., Vol. II of VII.

[16]  State Rec., Vol. I of VII, minute entry dated June 17, 2009.

2009.[17]   On July 14, 2009, the Louisiana Supreme Court also denied relief;[18] however, coincidentally, his trial commenced in the state district court on that same date, approximately twenty-nine and one-half months after his arrest.

Concerning speedy-trial claims, the United States Fifth Circuit Court of Appeals has explained:

> The right to a speedy trial is guaranteed by the Sixth Amendment and applies to state criminal proceedings through the Fourteenth Amendment.  A violation of the speedy trial right, if found, requires dismissal of the indictment.  In Barker [v. Wingo, 407 U.S. 514 (1972)], the Supreme Court prescribed several factors to be considered when evaluating a speedy trial claim:  (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to speedy trial, and (4) prejudice to the defendant.

Goodrum v. Quarterman, 547 F.3d 249, 257 (5th Cir. 2008) (citations and footnotes omitted).

Regarding the balancing of those four factors, the United States Supreme Court held:

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant.  In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

Barker, 407 U.S. at 533 (footnote omitted).

Regarding the first factor, the United States Fifth Circuit Court of Appeals has held:

"If the length of delay crosses a threshold level regarded as presumptively prejudicial, the district court must make findings regarding the remaining three factors and balance all four factors.  This

---

[17]   State v. Green, No. 2009-K-0855 (La. App. 4th Cir. June 29, 2009); State Rec., Vol. III of VII.

[18]   State v. Green, 11 So.3d 502 (La. 2009) (No. 2009-KK-1588); State Rec., Vol. II of VII.

Circuit generally requires a delay of one year to trigger speedy trial analysis."  United States v. Lucien, 61 F.3d 366, 371 (5th Cir. 1995) (citation omitted).  In the instant case, petitioner's right to a speedy trial attached upon his arrest on February 2, 2007.  See, e.g., United States v. Greer, 655 F.2d 51, 52 (5th Cir. 1981) ("The constitutional assurance of a speedy trial attaches upon arrest, return of an indictment, or filing of an information, whichever first occurs.").  Because his trial did not commence until more than two years later, all four factors will be considered.

As to the first factor, the length of the delay, the delay was not of a magnitude normally considered unusually long.  See Laws v. Stephens, 536 Fed. App'x 409, 414 n.7 (5th Cir. 2013) (collecting cases), cert. denied, 134 S. Ct. 2133 (2014). Further, as the United States Fifth Circuit Court of Appeals explained:  "The *bare minimum* required to trigger a Barker analysis is one year.  *A delay must persist for at least eighteen months over and above that bare minimum for this factor to strongly favor the accused.*"  Amos v. Thompson, 646 F.3d 199, 206-07 (5th Cir. 2011) (footnote omitted).  The delay in the instant case fell below that thirty-month threshold, albeit barely.  Therefore, at most, this first factor weighs only "slightly to moderately" in petitioner's favor.  See Leachman v. Stephens, No. 12-20187, 2014 WL 4365179, at *11 (5th Cir. Sept. 4, 2014).

Regarding the second factor, the reason for the delay, the United States Supreme Court explained:

> Closely related to length of delay is the reason the government assigns to justify the delay.  Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.   A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the

> defendant.  Finally, a valid reason, such as a missing witness, should
> serve to justify appropriate delay.

Barker, 407 U.S. at 531 (footnote omitted).

Here, unquestionably, the delays were numerous.[19]  However, there is no evidence whatsoever that any of the delays were motivated by a desire to hamper the defense.  Rather, as noted in the state's response, the delays through until mid-2008 resulted primarily from difficulties in obtaining testing of the DNA evidence – testing which was desired by both the state *and the defense*.  While the state is ultimately responsible for that delay, it cannot be heavily penalized, in that there is no indication that the delay was purposeful or in bad faith, as opposed to simply being an unfortunate consequence of a criminal justice system still struggling in the post-Hurricane Katrina recovery.  Once the DNA testing was completed, many of the delays thereafter resulted from

---

[19]  Petitioner was arrested on February 2, 2007, and the bill of information was then filed April 18.  After he was arraigned on April 27, the defense filed various motions.  A discovery hearing was set for June 27, 2007; however, on the state's motions, that hearing was continued until September 10, December 12, and then, ultimately, January 16, 2008.  On January 16, the state district court had a trial in progress, and the hearing was therefore continued again to January 25.  As noted, petitioner then filed his motion for speedy trial on February 26, 2008, and the trial was set for May 13, 2008.  After a February 27 discovery hearing, additional motion hearings were then set in 2008 on March 14, April 14, April 29 (a hearing which was continued on the defense's motion), May 1, May 2, May 8, and May 12, at which time the state district court reversed its ruling granting petitioner's motion for a speedy trial.  Additional motion hearings were thereafter set in 2008 on May 16, May 28, June 26 (which was not held because petitioner was not brought to court), June 27, July 16, September 9 (which was continued on the state's motion), September 10 (which continued on the state's motion), October 9 (which not held because the court had a trial in progress), October 27, December 4 (which was continued on the state's motion), December 8 (which continued on the state's motion), and December 9 (which was not held because the court had a trial in progress).  In 2009, hearings were set for January 22 (which not held because the hearing had been set in error), March 12 (which was not held because the court had a trial in progress), April 21 (which was not held because the court had a trial in progress), April 28, May 28 (which was continued on the state's motion), June 12 (which was not held because the court had a trial in progress), and June 17.  Trial finally commenced on July 14, 2009.

- 14 -

the congested docket at Orleans Parish Criminal District Court.  Although the state also bears the

penalty for those delays, the penalty is again mitigated by the fact that the delay was unintentional,

rather than a deliberate tactic to imperil petitioner's ability to present his defense.  When all of these

considerations are taken into account, the Court finds that this factor arguably weighs in favor of

petitioner, but, again, only moderately.

Regarding the third factor, petitioner's assertion of his right to speedy trial, the United

States Supreme Court explained:

> Whether and how a defendant asserts his right is closely related to the
> other factors we have mentioned.  The strength of his efforts will be
> affected by the length of the delay, to some extent by the reason for
> the delay, and most particularly by the personal prejudice, which is
> not always readily identifiable, that he experiences.  The more serious
> the deprivation, the more likely a defendant is to complain.  The
> defendant's assertion of his speedy trial right, then, is entitled to
> strong evidentiary weight in determining whether the defendant is
> being deprived of the right.  We emphasize that failure to assert the
> right will make it difficult for a defendant to prove that he was denied
> a speedy trial.

Barker, 407 U.S. at 532-32.  Here, as already noted, petitioner asserted his right to a speedy trial.

However, it is important to note that he first asserted that right in his motion filed on February 26,

2008, more than a year after his arrest.  While that delay is not determinative, it is obviously

relevant.  See, e.g., Amos v. Thompson, 646 F.3d 199, 207 (5th Cir. 2011) ("This factor can also cut

against the defendant where there was a lengthy delay between his arrest or indictment and his

assertion of his speedy-trial right."); United States v. Parker, 505 F.3d 323, 329-30 (5th Cir. 2007)

("Mere assertion of the speedy trial right is not enough for this factor to weigh in a defendant's favor.

If he waits too long, his pre-assertion silence will be weighed against him.").  In Parker, the Fifth

Circuit found that the fact that defendant waited fourteen months to assert his right to a speedy trial

weighed against him.  Id. at 330; accord Robinson v. Whitley, 2 F.3d 562, 569 (5th Cir. 1993)

(twelve-month delay in asserting right).  In light of petitioner's lengthy delay in asserting his right

in this case, the Court finds that this factor weighs slightly to moderately in the state's favor.

Regarding the fourth factor, resulting prejudice, the United States Supreme Court

explained:

> Prejudice ... should be assessed in the light of the interests of
> defendants which the speedy trial right was designed to protect.  This
> Court has identified three such interests: (i) to prevent oppressive
> pretrial incarceration; (ii) to minimize anxiety and concern of the
> accused; and (iii) to limit the possibility that the defense will be
> impaired.  Of these, the most serious is the last, because the inability
> of a defendant adequately to prepare his case skews the fairness of
> the entire system. If witnesses die or disappear during a delay, the
> prejudice is obvious.  There is also prejudice if defense witnesses are
> unable to recall accurately events of the distant past.  Loss of
> memory, however, is not always reflected in the record because what
> has been forgotten can rarely be shown.

Barker, 407 U.S. at 532 (footnote omitted).

Here, petitioner has made no showing whatsoever that his ability to present a defense

was in any way impaired by the delay.  For example, he has identified no witnesses who were

unavailable or whose memories were dimmed as a result delay.  He also has identified no evidence

which was rendered unavailable.  On the contrary, as noted, much of the delay in this case resulted

from the difficulty in obtaining DNA testing of the physical evidence, testing which was desired by

the defense as well as the state.

In the absence of any such identifiable impairment, petitioner relies primarily on the

anxiety and concern which he purportedly experienced as a result of remaining detained throughout

the prolonged prosecution.  However, while such anxiety and concern are obviously relevant, it is also clear that "generalized expressions of anxiety and concern amount to little more than a nominal showing of prejudice."  Goodrum v. Quarterman, 547 F.3d 249, 263 (5th Cir. 2008); accord Leachman v. Stephens, No. 12-20187, 2014 WL 4365179, at *13 (5th Cir. Sept. 4, 2014) ("The trial court transcript reveals only Leachman's own assertions of stress and anxiety and no corroborating evidence of those assertions.  This factor thus does not favor Leachman."); United States v. Frye, 489 F.3d 201, 213 (5th Cir. 2007) ("[B]ecause the length of delay weighed against the government is so minor, and because Frye offered no evidence beyond his own testimony that he suffered anxiety, Frye's anxiety does not justify finding a speedy trial violation.").  Here, petitioner offers nothing other than such generalized expressions and, without more, that is insufficient.  See United States v. Herman, 576 F.2d 1139, 1147 (5th Cir. 1978) ("Herman does allege, however, that he was anxious and that his pre-trial incarceration was oppressive.  We agree with Herman that his pre-trial incarceration was unfortunate.  No one factor, however, controls the balancing process that determines whether a trial has been speedy.").[20]

---

[20] Petitioner does not expressly argue that his pretrial detention was "oppressive."  However, even if he had, it must be noted that the United States Fifth Circuit Court of Appeals likewise requires a particularized showing in support of such contentions.  For example, in Frye, the Fifth Circuit held:

> Finally, Frye's argument that he suffered oppressive pretrial incarceration is conclusory and not supported by evidence specifying harm.  A lengthy pretrial incarceration does not inherently offend a defendant's liberty interests.  See, e.g., Gray v. King, 724 F.2d 1199, 1204 (5th Cir. 1984) (finding no oppressive pretrial incarceration where defendant received credit for pretrial incarceration to be applied his sentence).  Frye was ultimately sentenced to life in prison without the possibility of release.  Therefore, Frye, like the defendant in Gray, did not suffer any increase in his total time spent in prison as the result of pretrial delays.  Because Frye has not

For all of these reasons, this fourth factor is, at best, neutral in the instant case.

In summary, no factor weighs heavily in petitioner's favor; in fact, it appears that only two factors weigh in his favor at all, one factor weighs in the state's favor, and one factor is neutral. Considering all of those factors, including, significantly, that petitioner has not proven that he suffered any actual prejudice whatsoever from the delay, this Court agrees with the state court's conclusion that petitioner failed to establish that he was denied a speedy trial in violation of the United States Constitution. Therefore, this claim should be rejected.

### C.  Ineffective Assistance of Counsel

Petitioner's next claim is that he received ineffective assistance of counsel. The state argues that this claim is unexhausted and, as a result, now procedurally barred. However, this Court can pretermit ruling on those issues because, as the state alternatively argues, the claim clearly fails on the merits for the following reasons.[21]

---

identified anything otherwise oppressive about the pretrial incarceration, Frye cannot establish that the pretrial incarceration created prejudice.

Frye, 489 F.3d at 213.

[21]  A federal court has the authority to deny a *habeas* claim on the merits regardless of whether the petitioner exhausted his state court remedies and whether exhaustion is waived by the state. 28 U.S.C. § 2254(b)(2); Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998); Lande v. Cooper, Civ. Action No. 11-3130, 2013 WL 5781691, at *26 n.68 (E.D. La. Oct. 25, 2013); Woods v. Cain, Civ. Action No. 06-2032, 2008 WL 2067002, at *8 n.8 (E.D. La. May 13, 2008). Likewise, a federal court need not decide whether a claim is procedurally barred if the claim clearly fails on the merits. Glover v. Hargett, 56 F.3d 682, 684 (5th Cir. 1995); Wiley v. Puckett, 969 F.2d 86, 104 (5th Cir. 1992); Lande, 2013 WL 5781691, at *26 n.68; Corzo v. Murphy, Civ. Action No. 07-7409, 2008 WL 3347394, at *1 n.5 (E.D. La. July 30, 2008); Lee v. Cain, Civ. Action No. 06-9669, 2007 WL 2751210, at *9 (E.D. La. Sept. 18, 2007).

Ineffective assistance of counsel claims are analyzed under the two-prong test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). Specifically, a petitioner seeking relief must prove by a preponderance of the evidence that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Id. at 697; Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993). To prove deficient performance, a petitioner must show that counsel's performance fell below an objective standard of reasonableness and, therefore, failed to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001); Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In this claim, petitioner appears to be contending that his counsel was ineffective for failing to challenge the prosecution on the basis that petitioner was denied his right to a speedy trial. However, that contention is simply factually inaccurate. As already noted, petitioner's counsel *did* file a motion to quash the bill of information based an alleged speedy-trial violation, and he further challenged the denial of that relief in both the Louisiana Fourth Circuit Court of Appeal and the Louisiana Supreme Court. Because counsel in fact did precisely what petitioner argues should have been done, his ineffective assistance claim necessarily fails.

### D.  Due Process/Equal Protection

In his federal application, petitioner also includes vague references to "due process" and "equal protection." To the extent that he is attempting simply to recharacterize the specific

claims already asserted herein by using different terms, no further analysis is required; those claims, regardless of how they are characterized, have no merit for the reasons discussed in detail in this opinion.  To the extent that he is contending that his rights to "due process" and "equal protection" were violated in some other way in his state criminal proceedings, the factual bases for those contentions are unexplained and his allegations are wholly conclusory.  It is clear that "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding."  Ross v. Estelle, 694 F.2d 1008, 1012 (5th Cir. 1983); accord Schlang v. Heard, 691 F.2d 796, 799 (5th Cir. 1982); Mayberry v. Davis, 608 F.2d 1070, 1072 (5th Cir. 1979).  For these reasons, petitioner obviously has not met his burden to establish that he is entitled to relief based on a purported due process or equal protection violation.

### E.  Brady Claim

Petitioner's final claim is that the state failed to disclose favorable evidence to the defense as required by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  It is beyond cavil that the prosecution may not withhold from the defense exculpatory or impeachment evidence.  The United States Supreme Court has explained:

> A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.  Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, although a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The reversal of a conviction is required upon a showing that the

> favorable evidence could reasonably be taken to put the whole case
> in such a different light as to undermine confidence in the verdict.

<u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-70 (2006) (per curiam) (internal citations and quotation marks omitted).  Therefore, to prevail on a <u>Brady</u> claim, a petitioner "must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment."  <u>DiLosa v. Cain</u>, 279 F.3d 259, 262-63 (5th Cir. 2002).

Here, again, petitioner's claim is entirely conclusory, consisting of nothing more than a passing reference to <u>Brady</u>.  He does not even identify what evidence was supposedly withheld, much less prove that it was in fact withheld, favorable to him, and material.  "[V]ague assertions do not establish any exculpatory evidence, let alone a reasonable probability that such evidence affected the outcome of the trial."  <u>United States v. Moore</u>, 452 F.3d 382, 388 (5th Cir. 2006).  Simply put: "Allegations that are merely 'conclusionary' or are purely speculative cannot support a <u>Brady</u> claim." <u>Murphy v. Johnson</u>, 205 F.3d 809, 814 (5th Cir. 2000); <u>accord Williams v. Scott</u>, No. 93-1342, No. 3:13-cv-1802, 1994 WL 612743, at *6 (5th Cir. Oct. 26, 1994) ("[C]onclusory allegations of a habeas petitioner are simply inadequate to raise a constitutional issue ...."); <u>Starks v. Stephens</u>, 2014 WL 128962, at *4 (N.D. Tex. Jan. 13, 2014); <u>Lively v. Director, TDCJ-CID</u>, Civ. Action No. 6:11cv477, 2012 WL 1649703, at *9 (E.D. Tex. Apr. 12, 2012) (In support of his <u>Brady</u> claim, "Petitioner offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus."), <u>adopted</u>, 2012 WL 1649645 (E.D. Tex. May 10, 2012); <u>Sherrill v. Thaler</u>, Civ. Action No. H-11-0337, 2012 WL 718942, at *16 (S.D. Tex. Mar. 5, 2012) ("A habeas petitioner is not entitled to relief based on conclusory and speculative allegations of a <u>Brady</u> violation.").  Therefore, petitioner's <u>Brady</u> claim should be rejected.

## <u>RECOMMENDATION</u>

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by James Edward Green be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[22]

New Orleans, Louisiana, this sixth day of January, 2015.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[22] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.